IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Frederick E. Schlafly, III,                    )
                                               )     Civil Action No. 6:06-0588-GRA-WMC
                              Plaintiff,        )
                                               )     **REPORT OF MAGISTRATE JUDGE**
                    vs.                        )
                                               )
Michael J. Astrue,                             )
Commissioner of Social Security,               )
                                               )
                              Defendant.        )
_____)

        This case is before the court for a report and recommendation pursuant to

Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this

District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

        The plaintiff brought this action pursuant to Section 205(g) of the Social

Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of

the Commissioner of Social Security denying his claim for disability insurance benefits

under Title II of the Social Security Act.


## ADMINISTRATIVE PROCEEDINGS

        The plaintiff was initially awarded a period of disability and disability insurance

benefits on January 27, 1998, based on a disability commencing February 5, 1996.

Subsequently, the plaintiff was notified that his disability ceased in October 2001 and his

benefits terminated as of the last day of December 2001.   The plaintiff requested

_____

        [1]A report and recommendation is being filed in this case, in which one or both parties declined to consent
to disposition by the magistrate judge.

reconsideration of this cessation determination, and his case was reviewed by a disability hearing officer. On June 10, 2002, the disability hearing officer concluded that medical improvement had occurred, and that but for alcoholism, the plaintiff was able to perform unskilled work at "light" and "medium" exertional levels. The disability hearing officer further concluded that with this residual functional capacity, the plaintiff remained unable to perform his past relevant work, but that there were a significant number of jobs existing in the economy at the "light" and "medium" exertional levels that he was able to perform.

On June 19, 2002, the plaintiff filed a timely request for a hearing. The administrative law judge before whom the plaintiff, his attorney, a vocational expert and a medical expert appeared, determined on March 25, 2005, that the plaintiff's disability ceased in October 2001 and that his entitlement to benefits ended at the close of December 2001. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on January 20, 2006. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff's disability ceased in October 2001, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant was found to be disabled within the meaning of the Social Security Act, beginning February 5, 1996, and he has not engaged in substantial gainful activity since that date.
>
> (2)    The claimant is 46 years old and has a "high school and above" education.
>
> (3)    The claimant has past vocational experience as a self-employee [sic] home repair person, a long-haul truck driver, an electrician, and as a drug testing technician. His jobs as a self-employee home repair person and as a long-haul truck driver were semi-skilled, medium work, and that his job as an electrician was semiskilled, medium to heavy work. As a drug testing technician, he performed low semi-skilled, light work.
>
> (4)    The Administrative Law Judge decision issued on January 27, 1998 is the last favorable decision on the

2

claimant's Title II application (Comparison Point Decision or "CPD").

(5)    The medical evidence establishes that when the claimant's disability began, he was suffering from the following medically determinable, "severe" impairments: the residuals of hemorrhoid surgery, chronic back pain, a personality disorder, and a depressive disorder.

(6)    Since the Comparison Point Decision, the claimant has continued to suffer from the following medically determinable, "severe impairments: a depressive disorder and a borderline personality disorder. He has also suffered from alcoholism and drug abuse, which are also medically determinable and "severe" impairments. Since the CPD, he has suffered from no other "severe" impairments.

(7)    Since the CPD, the claimant has not had an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1 to Subpart P of Social Security Regulations No. 4, including Listing 12.04 and/or 12.08. Although he continues to have chronic mental illnesses, his impairments are not of the level of severity required to satisfy the C criteria of any Listing, including Listing 12.04 and/or 12.08.

(8)    But for polysubstance abuse, the claimant has moderate limitations in social functioning, and no limitations in activities of daily living or in concentration, persistence, or pace. He has not experienced any extended episodes of decompensation.

(9)    The medical evidence establishes that but for alcoholism and drug abuse, there has been improvement in the claimant's medical condition since the Comparison Point Decision issued on January 27, 1998, and that this medical improvement is related to his ability to work.

(10)    The claimant's testimony regarding the continuing severity of his impairments and his resulting functional limitations was not fully credible.

(11)    Since October 2001, the claimant has experienced work-related medical improvement. But for alcoholism and drug abuse, he would be able to perform work without skill limitation, and with no physical limitations, he would be able to perform at least "medium" work, as described by the State Agency medical consultant at Exhibit B-12F. Without his drug and alcohol abuse, the claimant would have social interaction limitations,

3

only to the extent that he would not be able to engage in sustained interactions with others throughout the workday.

(12)   With the above-described residual functional capacity, the claimant would have been able to perform his past work as a long-haul truck driver but for alcoholism and drug abuse.

(13)   The claimant's polysubstance abuse, in combination with his emotional impairments, causes "moderate" limitations in daily living activities and in concentration, persistence, and pace, and "marked" limitations in social functioning. 20 CFR§404.1520a (b)(2).

(14)   Due to alcoholism and drug abuse, the claimant has been unable to work in any capacity as described in the body of this decision; however, because his polysubstance abuse is a material factor contributing to his disability, he is not "disabled" pursuant to Section and 1614(a)(3) of the Social Security Act, as amended by Public Law 104.121.

(15)   Because the claimant would have been able to perform his past work but for alcoholism and drug abuse, his disability ceased effective October 2001. 20 CFR §404.1594(0(8).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.


## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Richardson v. Perales*, 402 U.S. 389

5

(1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).   Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.   *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).   The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.   It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.   If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.   *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).   If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.   *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff is 46 years old.   He completed a GED degree and attended two years of college.   His past vocational experience was as a self-employed home repair person, a long-haul truck driver, an electrician, and a drug testing technician.

Medical evidence since the CPD shows that on May 6, 1999, the plaintiff saw Dr. Lawrence E. Roel at the Eastside Eye Center.   At that time, he had scar in the sclera of the right eye caused by being hit in the face with a chair 20 years earlier.   The plaintiff reported that he had been having headaches and decreased vision.   He underwent a scar (pterygium) excision with autografting on August 6, 1999.   When he was seen for follow-up care on August 19, 1999, he reported pain in his right eye and seeing "spots" and "circles around light;" however, his right eye vision was 20/30. His left eye vision was 20/20-2.

6

When he was reexamined the following month, he continued to report left eye pain.  His right eye vision was 20/40-2, and his left eye vision was 20/25-1.  He did not return to see Dr. Roel for any further treatment (Tr. 224-30).

On August 19, 1999, the plaintiff was seen at the emergency room with complaints of a four- to five-day history of neck pain.  X-rays showed only "very mild" spondylosis at C5-6, with no evidence of stenosis.  The plaintiff was treated and released the same day with a diagnosis of a neck sprain.  He returned to the emergency room on October 4, 1999, for treatment of asthmatic bronchitis.  After being administered an Albuterol nebulizer treatment and Prednisone, his condition improved, and he was sent home (Tr. 287-90).

On November 28, 1999, the plaintiff returned to the emergency room with complaints of chest pain, right upper quadrant pain, and right flank pain.  Urine testing was negative for substance abuse, and an ECG was normal.  The plaintiff was administered intravenous Demerol and Phenergan.  Later that day, he left the hospital against medical advice.  His only diagnosis was abdominal pain of unknown etiology (Tr. 231-37).

On August 10, 2000, the plaintiff saw Dr. Thomas E. Baumgarten at Piedmont Orthopaedic Associates.  At that time, he reported difficulty with lifting and gripping objects due to right elbow pain.  He had full active motion of the elbow; however, tenderness was present over the lateral epicondyle, and he had pain with gripping and with extension of the right wrist and right long finger.  Dr. Baumgarten's diagnosis was probable lateral epicodylitis.  On August 14, 2000, a tennis elbow release was performed, apparently with no complications.  The plaintiff did not return for a scheduled outpatient check-up on August 24, 2000 (Tr. 238).

On May 17, 2000, the plaintiff was seen at the emergency room with complaints of abdominal pain.  A liver panel was normal, a CBC was normal, and additional lab work showed normal Lipase and Amylase levels.  Once again, the plaintiff was treated

7

and released the same day.  His only diagnoses were gastritis and peptic ulcer disease. He returned for additional testing the following day, at which time a gallbladder ultrasound and an upper GI series were normal.  When he returned to the emergency room on May 27, 2000, he reported problems with a tennis elbow.  He was sent home after being advised to see his family physician for an intrathecal injection (Tr. 270-79).

On January 23, 2001, the plaintiff underwent an outpatient laparoscopic cholecystectomy (gallbladder removal).  He had no postoperative complications and he was discharged the same day in good condition with prescriptions for Lortab and Phenergan. A post-surgical pathology report confirmed that he had had "very mild," chronic cholecystitis (Tr. 243-69).

On February 5, 2001, the plaintiff was evaluated at the Spartanburg Area Mental Health Center.  He indicated that he had done well with taking Zoloft as prescribed, but he admitted to "some [recent] non-compliance."  He indicated that he had stopped drinking a year earlier, and that he was not suicidal but that he needed counseling to help him deal with anger, depression, anxiety, and guilt.  His initial diagnosis was a personality disorder and a mood disorder due to substance abuse, and he was assigned to Hal Stewart for individual mental health counseling (Tr. 431-41).

On February 21, 2001, the plaintiff saw Dr. Laurel A. Weston, a staff psychiatrist at the Mental Health Center.  At that time, he was alert, cooperative, and logical. His affect was euthymic, and he made appropriate jokes.  There was no evidence of any depressive symptomatology.  He told Dr. Weston that as long as he took Zoloft he "[did] just fine."  He further reported that he would "have employment in several weeks," and that he anticipated being able to pay for his medication then.  Dr. Weston continued him on Zoloft and provided him with samples.  The plaintiff was scheduled to begin counseling sessions with Mr. Stewart, but he did not return to the Mental Health Center.  On February 5, 2002, he was discharged from treatment due to "drop[ping] out of services" (Tr. 431-44).

8

On March 21, 2001, the plaintiff was seen for outpatient care at the Spartanburg Regional Medical Center with slurred speech and reports of chronic headaches. A CT brain scan was negative, with no abnormal fluid collections, a normal brain parachyma, and no evidence of any mass or mass effect (Tr. 240-42).

The following day, on March 22, 2001, the plaintiff was seen by staff psychiatrist Dr. A.M. Pederson at the Spartanburg Area Mental Health Center ("Mental Health Center"). At that time, he reported that he had started abusing Lortab that had been prescribed prior to his right elbow surgery, taking as many as twelve 1 0-milligram tablets a day. He stated that at the same time, he had been drinking alcohol, and that he "ended up" at Patrick B. Harris Psychiatric Hospital. He stated that he was doing better, and that he had stopped taking Lortabs "entirely." He indicated that he was seeing Hal Stewart, a counselor at the Mental Health Center, on a weekly basis. When he was interviewed that day, he was alert and oriented. He had no apparent hallucinations or delusions, was not homicidal or suicidal, and his thought content and thought progression were normal. He was continued on Zoloft, and he was advised to continue with outpatient counseling (Tr. 303).

On April 3, 2001, the plaintiff cancelled his counseling appointment at the Mental Health Center (Tr. 302), and on April 13, 2001, he was admitted to Patrick B. Harris Psychiatric Hospital. Prior to his admission, he said he had been drinking, he had "stuck himself with a needle" while at the emergency room, and had "tried to jump off the emergency room ramp." Hospital records indicated that this was the plaintiff's third psychiatric admission, and that he had a history of a longstanding personality disorder characterized by self-mutilation and a prior suicide attempt. At his admission interview, he explained that he became suicidal "every time [he] drank," but that he was no longer suicidal. He denied having any homicidal ideation or violent thoughts. His judgment was impaired, and he was apathetic and withdrawn. He was placed on drug therapy, including

9

Ativan, Zoloft, and Atenolol, and his condition "quickly stabilized." He showed no psychosis or significant depression during his hospital stay, and he stated that his emotional distress had been "entirely due to the alcohol and his over-responsiveness to stress induced by [his] alcohol abuse." He was discharged on April 18, 2001, with a diagnosis of an adjustment disorder, a personality disorder, and alcohol and opiate abuse. When he was interviewed prior to discharge, he was in good contact with reality with no evidence of suicidal or homicidal ideation, delusions, or hallucinations. He had good insight into his situation, his thoughts were linear, and his affect was bright. He was in good contact with reality, oriented, and was cooperative with outpatient planning. Staff psychiatrist Dr. Dennis C. Chipman indicated that his "admission was basically related to alcohol abuse" (Tr. 291-97).

When the plaintiff saw Mr. Stewart at the Mental Health Center on April 26, 2001, he reported that he was doing better, that he was on the "right track," and that he had "been lying to himself and others for too long." He reported that he was "sticking to going to AA [Alcoholics Anonymous] regularly." On May 3, 2001, he cancelled a scheduled counseling session, but he returned on May 29, 2001, for family counseling with his two daughters. On June 5, 2001, he missed another counseling session. When Mr. Stewart staffed the plaintiff's case with mental health social worker James Ball later that day, he noted that the plaintiff had "relapsed a couple of times" and continued to need help with family issues and "relapse prevention (Tr. 300-02).

On June 12, 2001, the Spartanburg County Jail called Mr. Stewart to request information regarding the plaintiff's medications. Mr. Stewart was told that the plaintiff was "in jail for fraudulent checks." On July 2, 2001, the plaintiff's case was staffed again with Mr. Ball. Mr. Ball indicated that he had seen the plaintiff only once, and that the plaintiff had failed to come to any of his group counseling sessions. In his opinion, the plaintiff's progress toward meeting his treatment goals was "unclear." He recommended that the

Mental Health Center continue services "a while longer to see if [the plaintiff would respond] to a closure letter" (Tr. 299).

On September 6, 2001, the plaintiff saw consulting physician Dr. Edmund P. Gaines, Jr.,  At that time, he reported that his primary problem was arthritic back pain, with occasional pain radiating down his legs to his knees.  He also reported episodic depression with five suicide attempts; arthritic pain in his hands, elbows, and ankles; a recurrent pterygium on his right eye; and residuals from hemorrhoid surgery that was performed a few years earlier.  He told Dr. Gaines that he had to have a spincterotomy following his hemorrhoid surgery, and that he had since developed fecal incontinence.  In addition, he reported a history of alcohol abuse, but he indicated that he had cut back to drinking to about six beers once a month.  He admitted, however, that he had stopped going to both Alcoholics Anonymous (AA) and Narcotics Anonymous (NA).  When he was interviewed that day, his affect was flat, but his communication skills were good.  Although he had a recurrent pterygium on his right eye, he retained 20/50 visual acuity in that eye, and his left eye visual acuity was 20/30.  He had full range of motion of the shoulders, elbows, and wrists, with no crepitus, and strength was "good" and equal in his upper extremities and both hands.  Finger apposition and small finger motion was also "good."  The plaintiff had full range of motion of both ankles, and despite crepitus in both knees, he was able to move his right knee from zero to 142 degrees, and his left knee from zero to 132 degrees.  Hip motion was from zero to 90 degrees on the right, and from zero to 88 degrees on the left.  Cervical range of motion was full.  Spinal rotation was positive for pain; however, range of motion of the lumbar spine was only limited by 20 degrees with extension and by five degrees with extension.  The plaintiff walked with a normal gait, without the use of any assistive device.  Lumbar spine x-rays were negative, with no evidence of fractures or significant subluxation.    Dr. Gaines' diagnosis included osteoarthritis, depression,

11

alcoholism, a pterygium on the right eye, and lumbar degenerative disease by the plaintiff's report (Tr. 304-08).

On September 13, 2001, the plaintiff saw consulting psychologist Joseph K. Hammond, Ph.D. He reported anxiety, depression, and poor concentration; however, during his clinical interview, he was well oriented, and he showed good judgment when presented with hypothetical situations. He made six errors in two minutes when performing Serial "7's"; however, he was able to multiply "5x13," and he was able to quickly and correctly state the months of the year in reverse order. He was able to repeat a four-word list, and he was only "mildly" impaired as to recalling four words after a five-minute delay. He was able to follow directions and organize his behavior well enough to draw a clock and make it tell a specific time. He admitted that he was continuing to drink "once in a while," but he denied that alcohol was a problem except for making him depressed. He later admitted that his alcohol abuse was causing him to have relationship problems with his wife, that he had tried unsuccessfully to cut back on his drinking, and that he felt guilty about his inability to limit his consumption. He told Dr. Hammond that he was drinking about twice a month, "perhaps" consuming about a six-pack of beer at a time. Dr. Hammond concluded that the plaintiff had moderate limitations in daily living activities and in concentration, persistence, and pace, and that he was "moderately to severely limited" in social functioning. He noted, however, that alcohol and drugs were "material to [the plaintiff's] diminished functioning" (Tr. 309-12).

The plaintiff underwent massage therapy with his wife, Diane Schafly, from January 1999 through October 29, 2001. Treatment notes show that he reported generalized body soreness, with particularly pronounced pain at his lower back, legs, and right arm (Tr. 337-49).

The plaintiff was also under the care of Dr. Michael F. Myers at the James-Willmot Clinic from October 13, 2000, through December 17, 2001. Treatment

12

notes show that he had various unrelated complaints, including sinus problems, cold symptoms, and stomachaches. Drug testing in October 2000 and July 2001 was negative; however, no testing was done to ascertain whether he was abusing alcohol (Tr. 350-60).

The plaintiff has also seen Mark Fullerton, D.C., for chiropractic treatment for several years. By letter dated January 7, 2002, Dr. Fullerton indicated that he had treated the plaintiff for "thoracolumbar soreness, sinusitis, and neck, elbow, and shoulder pain." He stated that the plaintiff had fibromyalgic-type symptoms, that his response to treatment had been "fair," and that his long-term prognosis was "poor" (Tr. 362).

On March 1, 2002, the plaintiff began therapy with Melissa Campbell, LMFT, at SAFE Homes for treatment of depressive symptoms and panic attacks. At a counseling session on March 7, 2002, he reported that he [lost] control when he start[ed] drinking, which [was occurring] about once a month" (Tr. 426-30).

On March 10, 2002, the plaintiff was transferred from the emergency room to the Patrick B. Harris Psychiatric Hospital after repeatedly sticking himself in the arm with a needle. At that time, he reported that "when [he got] drunk, he [got] suicidal." Admitting staff psychiatrist Dr. Sabi Illangakoon concluded that the plaintiff's "principle problem [was] one of alcohol... and drug addiction," and he was being admitted to Patrick B. Harris only because there were no beds available at Morris Village, a substance abuse rehabilitation facility. Dr. Illangakoon further noted that "[the plaintiff], himself, [had agreed] that he would best get help at an alcohol and drug unit." The plaintiff adamantly denied being suicidal, explaining that he had "stuck himself multiple times on the left forearm," only in attempt to get attention. He reported a past history of injecting cocaine, and he stated that he had last smoked cocaine "yesterday." While he reported that he only smoked cocaine about once a month, he said he spent $1,000 on it each month and his credibility on frequency was considered to be questionable. When interviewed, he denied having homicidal or other violent thoughts, and he was calm, pleasant, and oriented. His immediate, recent, and

13

remote memory was intact, as was his attention and concentration.  Upon physical examination, no abnormalities were noted other than the puncture marks that he had intentionally made on his left foreman.  Grip strength and finger-to-nose testing were normal bilaterally, and tandem walking was also normal.  Muscle strength was normal in both upper and lower extremities, visual acuity was "grossly normal" on both sides, and no range of motion limitations were noted.  A sensory examination was unremarkable.  The plaintiff's diagnosis was alcohol, cocaine, and Lortab dependence.   He was placed on a Librium/Alkavite protocol for detoxification, and he was prescribed Zoloft. He was discharged on March 28, 2002 (Tr. 468-75).

On April 10, 2002, the plaintiff was re-admitted to Patrick B. Harris Psychiatric Hospital.  At that time, he reported that shortly after his last hospitalization, he had "relapsed back into drinking," had become frustrated, and had "scratched himself multiple times in a self-mutilation type of situation."   A urine drug screen was positive for Benzodiazepines, cocaine, and opiates.  The plaintiff was detoxified and was placed on pain medications.  He had a brief allergic reaction to the pain medications; however, after this problem resolved, his condition stabilized.  When he was discharged on April 30, 2002, he was alert and oriented with no evidence of mania or psychosis.  His GAF had improved to 70 (Tr. 476-81).

Following his April 2002 hospitalization, the plaintiff resumed outpatient counseling with Ms. Campbell.  On May 1, 2002, he reported that when he drank, he became self-abusive, and that he was "okay as long as he [didn't] drink."  When he was interviewed that day, his mood was stable, and he was not having suicidal thoughts (Tr. 423).

The plaintiff continued to undergo chiropractic adjustments, and his condition apparently improved.  On June 12, 2002, Dr. Fullerton indicated on an insurance company's "Disability Claim Form" that the plaintiff's pain would only be "temporarily" disabling.  On an

14

updated form dated October 8, 2002, he further indicated that the plaintiff should be able to resume "some of the duties of [his] occupation by December 2002" (a tentative return-to-work date) (Tr. 443, 451).

The plaintiff continued to see SAFE Homes counselor Ms. Campbell, and on November 5, 2002, he reported that he had not experienced any recurrent "major episodes of depression." He stated that he was doing more to help out around the house, was working two days a week, and was "keeping [his wife] happy." Ms. Campbell concluded that his depression was improving (Tr. 417).

Since November 26, 2002, the plaintiff has been seen sporadically by Dr. James Gragg at Woodruff Family Medicine or treatment of various unrelated complaints, including dyspepsia, foot pain, nasal congestion, osteoarthritis, joint pain, and abdominal pain. The following month, chest x-rays showed a chest lesion, and the plaintiff was encouraged to undergo a CT chest scan. He apparently did not do so (Tr. 376-408).

When the plaintiff returned to see Ms. Campbell at SAFE Homes on January 9, 2003, his depression had improved. Ms. Campbell noted that he was inconsistent about keeping his counseling appointments (Tr. 416).

The plaintiff did not see Ms. Campbell again until April 8, 2003. At that time, he reported making another suicide attempt by overdosing on Zoloft, cocaine, Valium, and Prednisone. He did not indicate when this suicide attempt had occurred (and there is no record of any treatment from this event); however, he reported that over the last two months, he had been doing well. He was diagnosed with major depression and a panic disorder, and he was advised to resume weekly counseling/cognitive behavioral therapy sessions. Despite his emotional problems, he had a Global Assessment of Functioning (GAF) of 65. By May 2, 2003, his GAF had improved to 70; however, when he returned for counseling on June 3, 2003, his GAF had decreased to 60, possibly as counseling notes reflect, because the previous Wednesday, he had "[gotten] drunk" (Tr. 413-15).

15

On November 25, 2003, the plaintiff saw Dr. Stephen P. Geary at the Oakwood Orthopaedic Clinic with complaints of right shoulder, neck, and side pain. At that time, Dr. Geary noted that earlier that month, an MRI scan of the right shoulder had been essentially normal, with no rotator cuff tear, a normal labrum, and a "minimal" cyst. When the plaintiff was examined that day, there were no palpable masses at his neck. Spurling's testing was positive, and he exhibited "marked" guarding with neck rotation; however, impingement testing was only mildly positive, and neck motion was "fairly well preserved," with "good" internal and external rotation strength. The plaintiff had full range of motion of both elbows and wrists, and x-rays of the right shoulder showed "fair" preservation of the cartilage spaces, with no calcific deposits. Dr. Geary's diagnosis was "cervical radiculitis versus radiculopathy," and right dominant rotator cuff tendonitis. He administered an injection of Depo-Medrol and Lidocaine to the plaintiff's right shoulder (Tr. 372-73).

The plaintiff underwent cervical spinal MRI on November 26, 2003. Dr. Geary reported on December 3, 2003, that the MRJ showed "no significant abnormality to suggest any neural impingement nor any [herniated disc]." He concluded there was no surgical problem present in the plaintiff's neck or shoulder, and no further treatment was needed. On that day, the plaintiff reported that the injection had "helped" him. He had approximately 80% full rotation of the neck to both sides, with pain only at the extremes of motion. Forward motion of the right shoulder was fully vertical, with external rotation to over 100 degrees. Internal rotation was to T12, with only a minimal impingement sign. The plaintiff had no appreciable motor deficits in his upper extremities, and no problems were noted as to his lower extremities. Dr. Geary prescribed only a "cycle of [physical] therapy (Tr. 371).

The plaintiff returned to see Dr. Holt on March 24, 2004, after an absence from treatment of approximately six years. At that time, he reported increased left foot and hand pain. Dr. Holt noted that prior x-rays of the shoulder and a prior MRI scan of the lumbar spine had been unremarkable. When the plaintiff was examined that day, his gait

was only a "little" stiff, and while there was some tenderness in his hands, there was no soft tissue swelling.  There was no redness and only "equivocal" swelling at the left ankle, and the right ankle was normal.  The cervical spine was unremarkable.  X-rays on March 23, 2004, were normal as to the left foot and both hands.  Dr. Holt noted that while the plaintiff complained of peripheral joint pain, there was "[not] much evidence of active synovitis or degenerative changes."  The plaintiff was advised to return to Dr. Holt's office in three to four weeks; however, he apparently never did so (Tr. 374-75, 494).

The plaintiff did not return to see Ms. Campbell at SAFE Homes until June 17, 2004, an absence from treatment of approximately one year.  At that time, he reported his depression and chronic pain were "exacerbating each other."   Based on his statements, she assigned a GAF of 55.  By letter dated June 18, 2004, Ms. Campbell noted that while the plaintiff had reported worsening depression, he had not undergone any psychiatric hospitalizations since 2002 (Tr. 409).

On April 1, 2004, Dr. Vijayan Mangannan noted on a medical report that the plaintiff had abnormal liver enzymes, with a differential diagnosis of possible hemochomatosis, infectious hepatitis, or autoimmune hepatitis.  He indicated that additional blood tests and a liver biopsy would be needed to pinpoint a specific diagnosis.  Blood tests showed that the plaintiff had Hepatitis C antibodies, genotype 2b.  All other blood work was normal except for mild elevations of the liver functions AST and ALT.  The diagnostic impression also included depression and "minimal exterior hemorrhoids" (Tr. 482-93).

On July 22-23, 2004, at the request of his attorney, the plaintiff saw Luther A. Diehl, Ph.D., for a psychological evaluation.  At that time, he reported difficulty focusing, having a short temper in work settings, feeling depressed, and having "panic episodes" that varied depending on the amount of pressure that he was experiencing.  Despite these complaints, his thought progression was logical during his clinical interview, and he was able to understand directions and put forth a reasonably good effort when tested.  His

17

scores on the Beck Depression Inventory were consistent with severe depression, and personality testing (MMPI-2) was consistent with depression, somatic complaints, and anxiety. His scores on valid intelligence testing (WAIS-3) were within the average range (i.e., verbal IQ score of 91; performance IQ score of 92; and, a full scale IQ score of 91). Similarly, valid achievement scores (WRAT-3) showed a post-high school reading level and a high school spelling level. With respect to the plaintiff's personality testing, Dr. Diehl did not rule out the possibility that he was "consciously exaggerating" his impairments. The plaintiff told Dr. Diehl that he had not been abusing alcohol for three months, and that his drug abuse was even "more in the past." Dr. Diehl's diagnostic impression included a severe, recurrent major depressive disorder without psychotic features; a pain disorder; drug abuse in sustained full remission; alcohol abuse in early remission; and a borderline personality disorder with antisocial traits. Based on his assessment of the plaintiff's emotional impairments, the plaintiff would meet the criteria for Listings-level impairments pursuant to Listings 12.04, 12.07, and 12.08 *Tr. 455-66).

At the August 25, 2004, hearing, the plaintiff testified that since the CPD, he has continued to be disabled due to fibromyalgia, arthritis, back pain, eye problems, left foot problems, and fecal incontinence caused by his prior hemorrhoid repair surgery. He further testified that 15 years ago, the Spartanburg Blood Bank notified him that he was "positive" for hepatitis C, and that he continues to feel chronically weak and tired.

According to the plaintiff, his overall condition has gotten worse since he was first awarded disability benefits. He testified that he now has arthritic pain in his hands, neck, right shoulder and left ankle, and that even though he is using Duragesic patches, the pain is "so bad" that he is sometimes unable to get out of bed. He stated that due to "problems" with his arms, he can lift and carry only about five pounds, and he can no longer play his guitar. According to the plaintiff, he has to constantly shift positions because he "hurts" when he sits in one spot for too long. He further testified that he has to either move

about or sit down to rest after standing for brief periods of time, and that he has difficulty concentrating due to chronic pain.

The plaintiff testified that when he was nine years old, he went to live with his grandparents because his father was in prison and his mother "left" him. He stated that his mother is still living, but that when he was 13 years old, his father was murdered. According to the plaintiff, he has had emotional problems since childhood and has had "a lot" of hospitalizations due to emotional distress. He testified that over the years, he has engaged in self-mutilation by intentionally shooting himself three times, stabbing himself, and by sticking fish hooks into his body. According to the plaintiff, he last put fish hooks in his body in March 2002 and as a result of this instance of self-mutilation, he was admitted to a psychiatric hospital for 18 days. According to the plaintiff, this hospitalization was not alcohol-related, and during his hospital stay, he was "certified as mentally ill" by the State. He testified that he continues to get frustrated and nervous whenever he is around other people, and that due to stress, he has a "scaling" rash on his hands. He indicated that he feels like he is a burden to his family, and that he continues to see Melissa Campbell, a counselor at SAFE Homes. He also indicated that he is currently taking Lexapro for depression. He did not report taking any other psychotropic medications (Tr. 220-23).

The plaintiff testified that he was incarcerated from 1979 through 1982 for strong arm robbery, and that in 1990, he was convicted twice for driving while under the influence of alcohol. He stated that in the past he has had a drinking problem, and that he used to get drunk and become suicidal when he was depressed. He denied ongoing alcohol abuse. He indicated that except for drinking "one and a half beers" four months prior to the hearing, he had not consumed any alcohol since 2001.

The plaintiff lives with his wife and three children, ages 10, 16, and 19. His wife works as a massage therapist. According to the plaintiff, he does not do any

19

"significant" housework, and he relies on his son to do all of the yard work. He testified that he spends most of each day sleeping or just sitting around the house, listening to music.

At the hearing, the plaintiff identified various jobs that he has held since January 1999, including jobs as a short haul truck driver, an automobile auction jockey, a self-employed repair person, and a long-haul truck driver.

## ANALYSIS

On January 27, 1998, the plaintiff was found to be disabled from the residuals of hemorrhoid surgery, chronic back pain, a personality disorder, and a depressive disorder (Tr. 35). On October 17, 2001, the Commissioner notified the plaintiff that due to medical improvement he was no longer disabled effective October 2001, and that his benefits would end in December 2001 (Tr. 135-40). Pursuant to the plaintiff's request, a hearing before an ALJ was held on August 25, 2004. The plaintiff, his attorney, medical expert Laurie Hamilton, and a vocational expert were present for the hearing (Tr. 67). After the testimony of the plaintiff and brief testimony by the vocational expert as to the past relevant work of the plaintiff, the ALJ stopped the hearing and stated she would schedule a supplemental hearing after receiving additional medical evidence and reports that she deemed to be material (Tr. 116-19). Specifically, the ALJ stated that she would do a supplemental hearing after receiving evidence from Patrick B. Harris Psychiatric Hospital and Spartanburg Regional Hospital regarding the plaintiff's hospitalizations in 2002 (Tr. 116-17). She further indicated that the supplemental hearing would be scheduled for October (Tr. 119). On August 31, 2004, the ALJ received medical records from the plaintiff's attorney regarding those hospitalizations (Tr. 468-94). No supplemental hearing was ever scheduled.

On March 25, 2005, the ALJ issued a decision that the plaintiff's disability ceased in October 2001. The ALJ found that since January 27, 1998, the comparison point date decision, the medical evidence showed that there had been improvements in the

20

plaintiff's impairments related to his ability to work (Tr. 35-39).  The ALJ concluded that because the plaintiff would have been able to perform his past work but for alcoholism and drug abuse, his disability ceased effective October 2001 (Tr. 42).   No mention was made in the decision of the supplemental hearing that the ALJ was to hold or the reasons why the supplemental hearing was not held.  Further, it does not appear that the plaintiff's attorney was ever advised that a supplemental hearing would not be held.  The plaintiff argues that the ALJ failed to provide him a full and fair hearing because she did not conduct a subsequent hearing to consider additional evidence as well as to obtain medical and vocational expert testimony (pl. brief 5).  The plaintiff argues that he lost the opportunity to question the medical and vocational experts whose opinions would have been material to the determination of whether his disability had ceased (pl. brief 6).   Further, because he was not advised that the supplemental hearing would not be held, the plaintiff lost his opportunity to independently obtain additional medical expert or vocational testimony (pl. brief 8).

        "The ALJ in a social security case has an independent 'duty to fully and fairly develop the record and to assure that the plaintiff's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir.1996)).  "Plaintiffs in disability cases are entitled to a full and fair hearing of their claims, . . .  and the failure to have such a hearing may constitute good cause sufficient to remand to the Secretary under 42 U.S.C. § 405(g) for the taking of additional evidence." *Sims v. Harris*, 631 F.2d 26 , 27 (4th Cir. 1980).  This court agrees with the plaintiff that the ALJ failed to give him a full and fair hearing by not scheduling the supplemental hearing as she said she would.  Accordingly, the case should be remanded to the ALJ to schedule a supplemental hearing with both the medical and vocational experts present to consider all the evidence, including the evidence submitted at the request of the ALJ after the August 2004 hearing.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

February 28, 2007

Greenville, South Carolina

22